UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MOTEKAITIS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>USI INSURANCE SERVICES, LLC, et al.,<br><br>    Defendants. | Case No. 24-cv-00885-RS<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

Plaintiffs Paul Motekaitis and Carri Mangelli Kneass aver that they were defamed by a long list of Defendants, including their former employer USI Insurance Services, LLC and its employees James D. Kane, Karen Mondshine, Scott Pinette, Cindy Gross, Ernest J. Newborn, II, and Mike Sicard. In essence, Plaintiffs claim that USI and its top brass harmed them by writing and then widely disseminating a maliciously false email about the circumstances of Plaintiffs' split with the firm. The above-named Defendants now move for summary judgment on all claims, arguing that their communication was privileged and, in the alternative, that it contains only true or opinion statements. For the reasons explained below, the summary judgment motion is granted.

## II. BACKGROUND

This order assumes the parties' familiarity with the facts, discussed briefly below. In relevant part, the operative third amended complaint ("TAC") avers that Defendants sent an email in January 2024 that defamed Plaintiffs.

Prior to the email, Motekaitis and Kneass, insurance brokers, had managed the San Francisco private risk management group of Defendant USI Insurance Services ("USI"), a national insurance brokerage firm.[1]  In December 2022, Cincinnati Insurance Company ("CIC"), an insurance carrier that partners with USI, alerted Kneass that another USI employee in her office had changed a date on a document in order to obtain an insurance quote.  More specifically, it determined that one of Plaintiffs' team members, Winnie So, had submitted a falsified city building inspection report, which she had altered to show that a particular residence had a bolted foundation (contrary to what the actual report had shown).  This falsification violated USI's code of conduct.

Plaintiffs responded to CIC's representative that they had notified USI human resources and that they would be auditing all the accounts that their subordinate had worked on during the past six months.  They also said they would assign all CIC accounts to another employee.  Yet, in depositions, Plaintiffs conceded that they did not report the incident to USI's HR department or anyone else at the firm, including the compliance or legal teams.  A later investigation found that the incident was never brought to the attention of USI HR or Legal teams.  Nor did Plaintiffs audit all the accounts on which So had worked—instead they conducted a "spot audit" in which Kneass looked at "building permits for two clients [from four carriers]," comparing them to online examples, and Motekaitis audited five clients.  *See* Kneass Tr., Dkt. No. 107-5, at 38–39.  As for assigning the CIC accounts to another employee, Plaintiffs did not; So continued to work on CIC business, though Plaintiffs asked other team members to check her work—and did not permit her to communicate with CIC while working on its accounts.

In April 2023, CIC contacted Kneass again because So was still working on CIC accounts.  Kneass said she was unaware of that fact and would put a stop to it.  Nevertheless, So continued to

---

[1] Defendant Kane is USI's national practice leader of personal lines; Mondshine is USI's national director of personal risk operations; Newborn is USI's general counsel; Sicard is USI's CEO; Gross is an account executive at USI; and Pinette is a project manager in the personal risk operations department of USI.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 24-cv-00885-RS

2

work on the accounts, with supervision by other team members.

On September 18, 2023, CIC discovered another falsified document submitted by Plaintiffs' team. CIC also learned that So was still working on its business. CIC's employee, Ulli Krell, emailed Kneass, questioning why it allowed her "to continue working on Cincinnati business after you had assured us she wouldn't?" Ex. B-5, Dkt. No. 107-8, at 2. He also questioned how the audit had missed the falsification, considering that it dated back to April 2022 (before the initial incident).

Krell then escalated matters a few days later, emailing Kane on September 22 to voice CIC's concerns about the fraudulent submissions and So's continued involvement on the accounts despite Kneass and Motekaitis's assurances to the contrary. Krell also emailed Plaintiffs that same day, explaining that CIC would not accept any new business from them and would now be coordinating with USI's senior leadership instead of the San Francisco office. USI, meanwhile, undertook an extensive investigation into CIC's concerns, reviewing the reports of falsification and Plaintiffs' response, examining So's email records (as well as those of Alyssa Motekaitis, Motekaitis's daughter, who also worked in the office), interviewing Plaintiffs, scrutinizing Kneass's spot-check audit; and consulting the firm's internal code of conduct and employee handbook. *See generally* USI Internal Investigation Report, Dkt. No. 107-21.

During the course of the review, So and Alyssa Motekaitis admitted that they falsified the two documents CIC identified and denied altering at least eight other falsified documents that USI discovered. They had used PDF editing tools to manipulate certain words. Although USI found no evidence that the two colluded with each other or anyone else, it determined that Plaintiffs failed to follow USI's Code of Business Conduct and also failed to notify USI leadership, HR, compliance, or legal teams about the incidents. Plaintiffs' actions, including their misleading statements about whether So would continue working on CIC work and their misdirection about having conducted a complete audit, amounted to, in USI's findings, an ethical failure.

USI made plans to terminate So and Alyssa Motekaitis, but the pair resigned before termination occurred. It also notified Plaintiffs, on January 19, 2024, that they were being

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 24-cv-00885-RS

terminated as well. That same day, Kane sent an email to clients serviced by Plaintiffs' team to explain the situation. *See generally*, the Kane Email, Dkt. No. 107-11. In relevant part, the email stated:

> Recently, one of our insurance company partners brought to my attention several instances where employees of that specific PRM group submitted information that had been altered from the information provided by the PRM clients. The insurance company raised this issue with me directly because they had not received an adequate response from that specific PRM groups' leaders, Paul Motekaitis and Carri Mangelli.
>
> After the insurance company brought this issue to my attention, USI thoroughly investigated these incidents and confirmed that two employees of that specific San Francisco based PRM group had intentionally falsified property information on multiple submissions to that company. One of the two employees involved with these false submissions was a close family member of Paul Motekaitis. Both employees ultimately confessed that they had falsified certain client's property information to place unqualified properties in the insurance company's program. I should note that not only were these actions a serious breach of trust, and an egregious violation of USI's standards of business conduct, but the falsified documents could also have easily led to a full denial of coverage in the event of any loss at these properties.
>
> At the conclusion of USI's investigation, the two PRM employees responsible for the false information both resigned immediately prior to USI terminating their employment — they are no longer employed by USI. The insurance company has advised us that it has reported both former PRM employees to the California Department of Insurance for the violation of their respective brokerage licenses.
>
> …
> USI has terminated the employment of the PRM leaders, Paul Motekaitis and Carri Mangelli, who were responsible for supervising the two former employees. Paul and Carri not only failed to notify USI Leadership or USI Compliance when these extremely serious issues were raised by the insurance carrier, they did not adequately investigate or respond to the insurance carrier's concerns or the potential risks to client's coverage. Unfortunately, USI has lost confidence in their ability to lead this PRM group and uphold USI's Code of Conduct policies.

*Id.*

Following the email, Plaintiffs filed the instant litigation.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 24-cv-00885-RS
4

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotation marks omitted).

After the moving party meets its burden, the nonmoving party must bring forth material facts, or "facts that might affect the outcome of the suit under the governing law" to preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 520 (1991). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). If the moving party meets its burden and the nonmoving party fails to raise a genuine question of material fact, then the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322–23.

### IV. DISCUSSION

Defendants move for summary judgment on all of Plaintiffs' claims. As to the defamation claims, Defendants argue they fail as a matter of law because the allegedly defamatory statements in the Email are privileged; in the alternative, they contend the claims fail because any factual statements in the email are true and because any nonfactual statements are opinion. Moreover, Defendants assert that claims against individual Defendants Cindy Gross and Scott Pinette fail

because both enjoy immunity under 47 U.S.C. § 230.  As to the derivative claims—i.e., blacklisting, failure to prevent blacklisting, tortious interference with prospective economic relations, and intentional infliction of emotional distress—Defendants say they fail in tandem with the defamation claims.  In the alternative, Defendants posit that Plaintiffs fail to establish essential elements of the derivative claims.

As explained in more detail below, Defendants sufficiently establish that the email comprises only statements that are either true or opinion such that no reasonable factfinder could find defamation.  As a result, summary judgment is granted in favor of Defendants as to both the defamation claims and the claims that derive therefrom.

**A. Defamation**

Plaintiffs' first two claims are state law defamation and defamation per se against Defendants USI, Kane, Mondshine, Sicard, and Newborn.  "To state a claim for defamation under California law, a plaintiff must allege the defendant (1) published a (2) false, (3) defamatory, and (4) unprivileged statement that (5) either has a natural tendency to injure or causes special damage."  *Chemla v. FedEx Corp. Servs., Inc.*, No. 20-cv-06581-RS, 2021 WL 4497862, at *2 (N.D. Cal. Mar. 29, 2021) (citing CAL. CIV. CODE §§ 44–46); *see also Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007).  To prove defamation per se, a plaintiff must establish that a "reasonable reader, [who] without any extrinsic aid beyond own intelligence and common sense, would perceive [the challenged statements'] defamatory meaning."  *Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 386–87 (1986) (citing CAL. CIV. CODE § 45(a)).

In the operative complaint, Plaintiffs aver the publication of false and defamatory statements "including, but not limited to" the following:

> (1) Plaintiffs intentionally or negligently failed to notify "USI Leadership" of both the First Incident and the Second Incident;
> (2) Plaintiffs did not adequately investigate or respond to Insurance Carrier A's concerns or to the potential risks to client coverage;
> (3) Plaintiffs were engaged in criminal acts; and
> (4) Plaintiffs engaged in a cover-up of wrongdoing at USI.

TAC ¶ 62.[2]

### 1. Common Interest Privilege

In moving for summary judgment, Defendants mount a compelling argument that the Kane Email was privileged under the common interest doctrine, which protects "communications made in good faith on a subject in which the speaker and hearer share[] an interest or duty." *See Kashian v. Harriman*, 98 Cal. App. 4th 892, 914 (2002) (citing CAL. CIV. CODE § 47(c)); *see also Botta v. PricewaterhouseCoopersLLC*, No. 18-cv-02615-RS, 2018 WL 11360442, at *4 (N.D. Cal. 2018) ("[W]hen one interested party communicates information in a commercial setting concerning the conduct of an employee to another interested party, the communication is covered within the qualified privilege").

Determining whether common interest privilege applies requires a two-step analysis. *Kashian*, 98 Cal. App. 4th at 915. First, Defendants must demonstrate the statements occurred on a "privileged occasion," described in more detail *infra*. *Id.* If they meet that burden, Plaintiffs then can prove through actual evidence that Defendants made the statement with malice. *Id.* If Plaintiffs do so, summary judgment is foreclosed; if they fail, summary judgment is warranted. *See, e.g.*, *Karimi v. Golden Gate Sch. of L.*, 361 F. Supp. 3d 956, 979 (N.D. Cal. 2019) (granting summary judgment where "there [was] no evidence from which a finder of fact could conclude that [defendant's] email was motivated by malice").

With respect to Defendants' initial burden, showing an occasion falls within the common interest privilege requires establishing that the speaker and the listener share an interest or a relationship which "afford[s] a reasonable ground for supposing the motive for the communication to be innocent," or, alternatively, that the listener requested the speaker to provide the information. *See* CAL. CIV. CODE 47(c). Because clients of USI comprise the majority of the Kane Email recipient list, Defendants contend that common interest privilege applies: in their view, they acted to protect their business relationships with clients who share an interest in broker missteps.

---

[2] The email in question—which Plaintiffs did not attach to their pleadings nor quote in full in their pleadings—emerged during discovery, and its relevant sections are reproduced *supra*.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 24-cv-00885-RS

7

1    Plaintiffs rebut this claim by highlighting the extent to which the email went to non-clients. One recipient, Bob Herzog, filed a declaration stating that he was not a USI client but rather a competitor, *see* Herzog Decl., Dkt. No. 109-6 ¶¶ 3-5. These facts suggest that Defendants have not established they sent the email to only those entities with which they had a "contractual, business or similar relationship." *See Kashian*, 98 Cal. App.4th at 914.

Defendants reply that, even if the email went to competing brokers, they, too, share a common proprietary interest with USI because they have "special concern for the subject matter of the communication" and because the communication could be of such "professional importance for them to know it." Reply Br., Dkt. No. 113 at 9 (citing *Inst. of Athletic Motivation v. Univ. of Illinois*, 114 Cal. App. 3d 1, 12 (1980)). In that case, the California Court of Appeal determined that a message criticizing a sports-specific psychological test as unreliable, sent to "those involved as professionals in the field of athletics," was protected under the common interest privilege because the recipients "had a potential interest in the subject matter which went well beyond general or idle curiosity." *See Institute*, 114 Cal. App.3d at 12. Professionals in the insurance field would likewise share a potential interest in the contents of the Kane Email, so Defendants fairly contend that the burden should shift to Plaintiffs for the demonstration of malice.

Although the question is close, summary judgment is not warranted as to the common interest privilege because a dispute of fact remains. The *Institute* case concerned a plaintiff's appeal of a jury's defense verdict that rested on jury instructions about the common interest privilege. That court specifically highlighted that it was "for the jury" to decide whether the Defendants "abused the privilege by disseminating the communication to an unreasonably broad group of recipients." *Id.* at 13. In other words, it is not clear as a matter of law that Defendants sent the email to only those competitors who would share a potential interest in its contents; whether all the recipients shared such interests is a disputed fact.

Because it is uncertain whether Defendants have met their burden of proving the privilege could apply, it is unnecessary to reach the question of whether Plaintiffs demonstrate the malice necessary to defeat the privilege.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 24-cv-00885-RS

### 2. Falsity and Opinion

Ultimately, Defendants prevail because the only factual statements in the email are demonstrably true, and any non-factual statements are unactionable opinions. For defamation liability to exist, "the statement must contain a provable falsehood" and, to this end, "courts distinguish between statements of fact and statements of opinion for purposes of defamation liability." *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 695 (2012). As relevant here, "[a]n opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true." *Ruiz v. Harbor View Comm. Assn.*, 134 Cal. App. 4th 1456, 1471 (2005). As for a factual statement, "the defendant need not justify the literal truth of every word of the allegedly defamatory matter. It is sufficient if the substance of the charge is proven true, irrespective of slight inaccuracy in the details, so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark." *Raghavan v. Boeing Co.*, 133 Cal. App. 4th 1120, 1132–33 (2005) (internal quotation marks and citation omitted).

Most of the at-issue language is true. For example, the first relevant statement is that "USI has terminated the employment of the PRM leaders, Paul Motekaitis and Carri Mangelli, who were responsible for supervising the two former employees." *See* Kane Email. The evidence confirms the truth of the matter asserted: both Plaintiffs admit they were responsible for supervising the employees, and nobody disputes that USI terminated their employment.

The next relevant line in the email contains both true facts and opinions for which a defamation claim may not lie. It states, "Paul and Carri not only failed to notify USI Leadership or USI Compliance when these extremely serious issues were raised by the insurance carrier, they did not adequately investigate or respond to the insurance carrier's concerns or the potential risks to client's coverage." The first clause is a statement of fact about the failure to notify Leadership or Compliance "when these extremely serious issues were raised" by CIC: Plaintiffs concede that they did not notify any of their superiors nor USI Compliance when CIC first raised the issues in 2022. Although Motekaitis purportedly told Kane about the second incident before CIC did, the email did not assert an order of operations—it simply highlighted that when CIC raised the issues,

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 24-cv-00885-RS

Defendants did not notify leadership or compliance, a true statement.[3] The truth provides Defendants "a complete defense against civil liability" for the first clause's contents. *Raghavan*, 133 Cal. App. 4th at 1132.

The second clause states that Plaintiffs did not adequately investigate or respond to the issues. A statement "accusing [Plaintiffs] of 'poor performance' is clearly a statement of opinion" and thus not defamatory so long as "it does not suggest any lack of honesty, integrity or competency on [Plaintiffs'] part nor . . . impute any reprehensible personal characteristic." *Gould v. Maryland Sound Indus.*, Inc., 31 Cal. App. 4th 1137, 1154 (1995), *as modified* (Feb. 9, 1995). This aspect of the email is therefore not actionable for defamation, either.[4]

The final statement—"Unfortunately, USI has lost confidence in their ability to lead this PRM group and uphold USI's Code of Conduct policies"—is also true. Kane testified that USI *did* lose confidence in Plaintiffs, and Plaintiffs present no evidence to the contrary. No juror reasonably could find that USI was lying about losing confidence in Plaintiffs on this record.

Plaintiffs' complaint attempts to distract from the actual words in the email by averring statements that do not appear. The first made-up claim is that the message stated, "Plaintiffs were engaged in criminal acts." The Kane Email says nothing of the sort. The second false claim is that "Plaintiffs engaged in a cover-up of wrongdoing at USI," another statement that features nowhere in the email itself. To be sure, certain details in the email could be combined to elicit such an inference (i.e., the note that one of the employees was a close relative of Motekaitis's, the

---

[3] In their opposition brief, Plaintiffs contend that Motekaitis *was* a part of USI Leadership, but that argument is unpersuasive in light of the testimony by his supervisor, Kane. Plaintiffs' also quibble about whether Kane "recently" found out about the events in question (as the email claimed), given that CIC contacted USI in September and the email did not issue until January. They provide no evidence to dispute the characterization of that time span as "recent," however.

[4] Even if it were arguably a statement of fact, it would seem true: Krell's emails and testimony ably demonstrate that he raised the falsifications with Kane because CIC believed Plaintiffs' response was inadequate. By all accounts, that response comprised what appears to have been a half-hearted audit and a failed promise to remove the responsible employee from the account, not to mention the re-occurrence of falsified documents by someone else on their team.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 24-cv-00885-RS

statement that Plaintiffs did not adequately investigate or respond, and the mention of reports to the California Department of Insurance about brokerage license violations). Indeed, in their opposition brief, Plaintiffs argue that the email does create such an inference such that it is actionable as defamation.

Defendants rightly respond that this "defamation by inference" theory is not in the complaint and thus waived—Plaintiffs cannot introduce a new theory of the case in an opposition brief. *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory. . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (citation omitted); *see*, *e.g.*, *Becker v. Wells Fargo Bank*, *N.A., Inc.*, No. 2:10-cv-2799-TLN-KJN, 2014 WL 3891933, at *14 (E.D. Cal.), *aff'd*, 672 F. App'x 660 (9th Cir. 2016) (granting summary judgment where plaintiff did not "premise his defamation claim in his third amended complaint on allegations" raised for the first time in an opposition to motion for summary judgment).

Even if it were not waived, Plaintiffs' innuendo theory fails to persuade. Plaintiffs cite to no evidence, other than self-serving third-party declarations, to support their claims that the email implied either (A) "plaintiffs turned a blind eye to the fraud by failing to inform UI leadership at all about the alteration of documents," and B) "plaintiffs themselves were involved in a cover-up and/or the fraud." Opp. Br.at 23. However, "to survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations" *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *see also S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) ("A party opposing summary judgment must direct [the Court's] attention to specific, triable facts"). Plaintiffs' failure to do so means no triable issues of fact exist about the implications of the email.[5]

All other components of the email not described *supra* are plainly statements of opinion

---

[5] Even if the inferential theory had more support, it would fail for the fact that—considering the record in this case—no reasonable factfinder could deem the alleged inference to be defamatory.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 24-cv-00885-RS

11

and/or true facts and do not merit further analysis. In short, the defamation claims fail because Defendants didn't say anything demonstrably false about Plaintiffs.

### 3. Section 230

A prior order in this case dismissed defamation claims against recipients of the Kane Email who forwarded it to others, reasoning that 42 U.S.C. § 230 protected them as Internet publishers. *Motekaitis v. USI Ins. Servs., LLC*, No. 24-cv-00885-RS, 2025 WL 711113, at *4 (N.D. Cal. Mar. 5, 2025). In the instant motion, Defendants Pinette and Gross argue they enjoy the same immunity because they merely re-sent the email to clients who said they had not received it. *See* TAC ¶¶ 52, 66, 74. Plaintiffs does not address this argument in opposition. For the same reasons explained in the prior order, and in light of Plaintiffs' waiver of the issue, Section 230 presents another reason why the defamation claims against Defendants Pinette and Gross fail as a matter of law.

## B. Derivative Claims

### 1. Tortious interference

Under California law, stating a claim for tortious interference with business relations requires "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Gill v. Marsh USA, Inc.,* No. 24-cv-02366-RS, 2024 WL 3463351, at *5 (N.D. Cal. July 18, 2024) (quoting *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 689 (9th Cir. 1990)).

With respect to this claim, Plaintiffs rely on their defamation claims to support the idea that Defendants acted intentionally to disrupt Plaintiffs' prospective economic relations. Defendants contend that, because Plaintiffs' defamation claims fail to survive summary judgment, this claim likewise falters. Plaintiffs concede as much in opposition. Summary judgment therefore also is granted as to the intentional interference claim.

### 2. Blacklisting

California law provides that "[a]ny person . . . who, after having discharged an employee from the service of such person . . . by any misrepresentation prevents or attempts to prevent the former employee from obtaining employment, is guilty of a misdemeanor." CAL. LAB. CODE § 1050. *See also id.* §§ 1052 (providing additional liability for supervisors who fail to prevent blacklisting) 1054 (providing private right of action). Thus, like defamation, blacklisting liability is precluded where there is no untrue statement. *See, e.g.*, *Newberry v. Pac. Racing Ass'n*, 854 F.2d 1142, 1152 (9th Cir. 1988) (affirming summary judgment for defendant where plaintiff offered no evidence from which a reasonable jury could conclude that the defendant's statement was untrue because the facts instead established that the statement was true).

As explained *supra*, the record shows that the Kane Email did not contain untrue statements or make misrepresentations about Plaintiffs. Summary judgment is therefore granted as to the blacklisting claim and the failure to prevent blacklisting claim.

### 3. IIED

Intentional infliction of emotional distress requires "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050–51 (2009).

Defendants contend that summary judgment is appropriate here because their conduct was neither extreme nor outrageous. "A defendant's conduct is outrageous when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* at 1050. Determining whether conduct may reasonably be regarded as extreme or outrageous is ordinarily the court's responsibility, making it appropriate for summary judgment. *Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1614 (2012).

Plaintiffs provide no evidence that the Kane Email amounts to conduct that exceeds all bounds of that usually tolerated in a civilized community. The third-party declarations submitted in opposition concern whether those individuals had ever seen an email like this one, but such

assertions fail to establish that the statements therein were so out-of-bounds as to be outrageous—especially in light of the statements' truth. Summary judgment is therefore granted as to this claim as well.

## V. CONCLUSION

Plaintiffs having failed to produce evidence of any genuine dispute of fact as to the truth of Defendants' statements, their defamation claims necessarily fail as a matter of law—and with them, Plaintiffs' derivative claims also fail. Defendants' summary judgment motion is therefore granted.

**IT IS SO ORDERED**.

Dated: July 24, 2025

_____
RICHARD SEEBORG
Chief United States District Judge